UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VINCENT J. COPPOLA, MICHAEL
BRESLIN, and OLIN MCDONALD, on
behalf of themselves and all others similarly
situated,

                              Plaintiffs,

          v.                                                          1:02-CV-1581
                                                                         (FJS/RFT)

BEAR STEARNS & CO, INC.; BEAR
STEARNS HOME EQUITY TRUST;
BEAR STEARNS INTERNATIONAL
LIMITED; and EMC MORTGAGE CORP.,

                              Defendants.
_____

APPEARANCES                                       OF COUNSEL

O'CONNELL & ARONOWITZ                    APRIL M. WILSON, ESQ.
54 State Street, 9th Floor                         MICHAEL D. ASSAF, ESQ.
Albany, New York 12207-2501
Attorneys for Plaintiffs

WHITEMAN OSTERMAN &                    ALAN JAY GOLDBERG, ESQ.
HANNA LLP                                             NEIL L. LEVINE, ESQ.
One Commerce Plaza, Suite 1900               MARGARET MARY
Albany, New York 12260                            CANGILOS-RUIZ, ESQ.
Attorneys for Defendants

SCULLIN, Chief Judge

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs commenced this class action pursuant to sections 3 and 5 of the Worker

Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2102, 2104, alleging

that Defendants ordered a plant closing and/or mass layoff without serving them with the written

notice that the WARN Act requires.

Currently before the Court are (1) Defendants' motion to strike Plaintiffs' jury demand pursuant to Rule 39(a)(2) of the Federal Rules of Civil Procedure; (2) Defendants' motion for summary judgment; (3) Plaintiffs' motion for summary judgment; and (4) Defendants' cross-motion to strike the affidavit of Plaintiffs' counsel, Michael D. Assaf.

## II. BACKGROUND[1]

The following facts are not in dispute.  National Finance Corporation ("NFC"), which had its headquarters in Clifton Park, New York, was in the mortgage lending business, typically, but not exclusively, originating loans that refinanced home mortgages.  Prior to November 1999, NFC had two major lines of credit to finance its lending operations.  The first was an "operating" credit line with BankBoston.  NFC used this line to fund the loans that it originated on a daily basis.  The loans served as collateral for advances on this line.  NFC's second line of credit was a larger "repurchase warehouse" line that Defendant Bear Stearns & Co., Inc. ("Bear Stearns")

---

[1] The Court's determination of the facts of this case is significantly complicated by the form in which Defendants presented their statement of material facts.  Many of their statements take the following form: "so-and-so's deposition testimony is such-and-such."  The natural response to such a statement is either to admit or to deny that the quotation or paraphrase accurately reflects the deposition testimony.  What Defendants do too frequently is say that "such-and-such is a fact" with citation to the deposition testimony that they believe supports that assertion.

However, at times, when one party makes an assertion in its statement of material facts and cites to deposition testimony to support that assertion, the other party responds by admitting that the deponent so testified.  Given these insufficiencies in both parties' submissions, unless the responding party provides citations to the record that show that a there is a genuine issue with respect to the assertion to which it is responding, the Court will deem the responding party to have admitted that assertion.  *See* L.R. 7.1(a)(3).

provided.  Approximately once a week, the loans on the BankBoston line were "swept" into the repurchase warehouse line, where they remained until NFC pooled them and sold them off to larger institutions in the secondary market.

A Master Repurchase Agreement ("MRA"), dated June 16, 1997, governed the repurchase warehouse line.  Under the MRA, Defendant Bear Stearns Home Equity Trust ("BSHET") was termed the "Buyer" and would purchase the home equity loans ("HELs") on the repurchase warehouse line, subject to NFC's right (and, in certain circumstances, obligation) to repurchase the loans, either when NFC found a buyer for them in the secondary market or in the event of a default under the MRA.  The MRA provided, in pertinent part, that, in the event of a default, the non-defaulting party could,

> (i) as to Transactions in which the defaulting party is [NFC], (A) immediately sell on a servicing released or servicing retained basis as [BSHET] deems desirable, in a recognized market at such price or prices as [BSHET] may in its sole discretion deem satisfactory, any or all Purchased HELs subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by [NFC] hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased HELs, to give [NFC] credit for such Purchased HELs in an amount equal to the Market Value therefor on such date against the aggregate amount unpaid Repurchase Prices and any other amounts owing by Seller hereunder . . . .

See Dkt. No. 72 at Pt. 15 at ¶ 11(e)(i).

Defendant Bear Sterns International Limited ("BSIL") entered into a second Master Repurchase Agreement ("BSIL MRA"), dated January 19, 1998, with NFC's wholly-owned affiliate NFC Funding Corp. ("NFC Funding").  Through the BSIL MRA, NFC Funding obtained financing from Defendant BSIL in return for pledging a residual certificate that NFC Funding

owned as a result of a securitization transaction through which loans that NFC originated were pooled for the purpose of supporting the issues of bonds for sale in the capital markets.

The loans on the warehouse repurchase line collateralized the amount outstanding on the line at any given time.  Consequently, the MRA required NFC to prepare and deliver to Defendant Bear Stearns weekly schedules of loans that were on the warehouse line, the aggregate amount of which was suppose to match the amount outstanding on the line.  When a secondary market investor purchased loans off the warehouse repurchase line, the MRA required NFC to repurchase the loans and pay the "repurchase price," which was the sum of the purchase price that Defendant BSHET had paid to NFC when the loans went on the line plus a "price differential."  Once NFC sold a loan off the repurchase warehouse line, it could remove the loan from the weekly loan schedule.

In late 1998, the premiums paid in the secondary market for the type of mortgage loans that NFC originated fell precipitously.  By the fourth quarter of 1998, NFC was suffering from a severe cash crisis.  Thereafter, BankBoston and Defendant Bear Stearns lowered the margin rates that they advanced to NFC for the loans that they funded, which further worsened NFC's financial situation.  As a result, in or about February 1999, David Silipigno, NFC's President and CEO, and others at NFC learned that NFC did not have enough money to fund continued mortgage loan operations.  Consequently, beginning in or about February 1999 and continuing through in or about November 1999, at the direction of David Silipigno and others, NFC diverted and misappropriated approximately $5,648,615.00 in proceeds from the resale of residential mortgage loans that it owed to Defendant Bear Stearns.

Effective August 24, 1999, NFC engaged Westwood Capital LLC ("Westwood") to assist

in the sale of NFC.  As Westwood was performing its due diligence in preparation for the sale, it encountered difficulty balancing NFC's cash reconciliation.  When Westwood posed a series of questions about the cash reconciliation to David Silipigno, he confessed that NFC had misappropriated millions of dollars that it owed to Defendant Bear Stearns, had doublepledged loans that were suppose to secure the repurchase warehouse line, and had covered up the misappropriation with months of fictitious loan schedules.  Westwood informed NFC that, unless it disclosed the misappropriation to Defendant Bear Stearns, Westwood would resign from the engagement to assist in the sale of NFC.

NFC eventually agreed to disclose the misappropriation and contacted Defendant Bear Stearns to arrange a meeting.  On Monday, November 15, 1999, at Defendant Bear Stearns' New York City office, David Silipigno, Gerry Gray, and Harvey Marcus[2] from NFC and Mark Sunshine from Westwood met with Paul Friedman, Tim Small, and Michael Alix from Defendant Bear Stearns.  After NFC disclosed the misappropriation, Defendant Bear Stearns adjourned the meeting for the day to evaluate the situation.  Essentially the same people, with the addition of John Garzone from Defendant Bear Stearns, met on November 16, 1999.  During this meeting, Mark Sunshine argued that NFC was still sellable and that Defendant Bear Stearns should wait for NFC to find a buyer so that Defendant Bear Stearns could recover its investment. The meeting was adjourned without any resolution as to how Defendant Bear Stearns would proceed.  However, on November 16, 1999, Defendant Bear Stearns issued a formal notice of default with respect to the MRA.  Later that same day, and on subsequent days, representatives from NFC, Westwood, and Defendant Bear Stearns continued to meet.

---

[2] At the time, Harvey Marcus was NFC's General Counsel and Senior Vice-President.

On or about November 23, 1999, several persons and entities, including NFC, NFC Funding, Defendants BSHET and BSIL, and David Silipigno, signed a letter agreement ("November 23, 1999 Letter Agreement") and a set of related documents, e.g., security agreements, stock pledge agreements, releases, guarantees, subordination and forbearance agreements, etc., acknowledging the contractual defaults, reciting the resignation of David Silipigno and others, and setting various other terms to which NFC and its principals agreed in order to induce Defendant Bear Stearns to continue doing business with NFC through the purchase of loans on a daily "flow" basis.  Two of the documents accompanying the November 23, 1999 Letter Agreement were stock pledge agreements that David and Joseph Silipigno signed.  Another accompanying document was a Unanimous Consent of the Board of Directors of National Finance Corporation that David and Joseph Silipigno signed ("unanimous Consent"). The Unanimous Consent purported to elect Harvey Marcus as President and CEO of NFC and stated that David and Joseph Silipigno had resigned "as Officers of the Company, effective November 23, 1999," and that

> Harvey I. Marcus is authorized to take any and all actions on behalf of the Company in the ordinary course of business to manage and operate the Company and to implement, execute, and perform the provisions of that Letter Agreement of November 22, 1999 between Bear Stearns Home Equity Trust and Bear Stearns International Limited ("Bear Stearns") and the Company and David B. Silipigno, and Joseph Silipigno all without prior notice to or the necessity of consent by the Board of Directors of the Company, that notice having been waived and that consent being given in advance.

*See* Dkt. No. 72 at Pt. 25.

The Uniform Consent also provided that "[t]he undersigned hereby give full power and

proxy to Harvey I. Marcus to vote the common stock owned by them in the Company and to vote on behalf of the undersigned as and when action may be required by the Board of Directors of the Company . . . ." *See id.*

Both before and after becoming NFC's President, Mr. Marcus maintained his principal legal offices in New Jersey. From November 18, 1999, to NFC's closure, he was present at NFC's Albany offices on a part-time basis. Defendant Bear Stearns had concerns about Mr. Marcus' ability to manage NFC in light of his lack of relevant experience. At some point, Mr. Sunshine contacted Bill Bradley, informed him that Westwood had a client with financial difficulties, and asked whether Mr. Bradley could come to Albany to help run the company while Westwood tried to sell it. Mr. Marcus then met with Mr. Bradley, at which time Mr. Bradley told him that he would like to help NFC.

All of Mr. Bradley's conversations about his compensation were with Mr. Sunshine and Mr. Marcus. However, Mr. Bradley demanded, and Defendant Bear Stearns agreed to and signed, a subordination letter agreement, under which, if NFC were sold, Mr. Bradley's $300,000 bonus would be paid before Defendant Bear Stearns' claims against NFC. The agreement also provided that, in the event of the liquidation of NFC in bankruptcy, Defendant Bear Stearns would subordinate $150,000 of its claims against NFC to Mr. Bradley. Nevertheless, despite this compensation agreement, Defendant Bear Stearns did not select Mr. Bradley; it merely did not voice any objection to NFC's selection of him. Furthermore, NFC was free to fire Mr. Bradley without Defendant Bear Stearns' prior approval. Mr. Bradley worked at NFC from November 29, 1999, to December 22, 1999, the day of NFC's closure.

Without either an operating or a repurchase warehouse credit line, NFC had no way to

fund the origination of loans, its first source of revenue, through origination fees, and without investors to buy loans in the secondary market, it had no way to sell loans, its second source of revenue, through purchase premiums.  As a result, if Defendant Bear Stearns had declined to buy loans on a "flow" basis as NFC originated them, NFC would have closed down immediately.

Defendant Bear Stearns sent its own underwriters to NFC so that Defendant Bear Stearns could make decisions about which loans it would buy from NFC without the delay that an off-site review process would otherwise cause.  After NFC's underwriting group approved a given loan, it was passed to a group of five to ten employees of the Clayton Group, a third-party due diligence/underwriting firm that Defendant Bear Stearns had retained to review loan files to determine whether they were suitable for Defendant Bear Stearns' immediate purchase through Defendant EMC Mortgage Corp. ("EMC").  Thus, on a daily basis, NFC's underwriting group would bring loans to the Clayton Group employees, who would review them for Defendant Bear Stearns' potential purchase and make sure that the loans complied with NFC's underwriting guidelines.  The Clayton Group employees would either approve or suspend the loan or ask for additional conditions on it – in the latter case, the loan went back to NFC's underwriters to address the Clayton Group's concerns.  Alternatively, Courtney Leonard, NFC's Vice President of Credit, would attempt to persuade the Clayton Group employees to approve the problem loan for funding.  Each day, NFC would assemble groups of loans that had successfully passed through both its underwriting process and the Clayton Group's due diligence review.  NFC would then send to Defendant EMC a date tape list of the loans that it would purchase that day, the premium on the loan sale, and any relevant information.  Defendant EMC would then wire monies to NFC so that it could fund the loans and disburse the money to the borrowers.

## III. DISCUSSION

**A.     Summary judgment standard**

A court may grant summary judgment when the moving party carries its burden of showing the absence of a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c).  In making this determination, the court must resolve all ambiguities and draw all reasonable inferences in a light most favorable to the non-moving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).  If the moving party has met its burden, the nonmoving party may not rely upon its pleadings but must come forward with specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).  "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).


**B.     The WARN Act**

The WARN Act generally requires an "employer" to give its employees notice before it "order[s] a plant closing or mass layoff." 21 U.S.C. § 2102.  The Act also provides that an employer who fails to provide the required notice will be liable to its employees for certain damages. *See* 21 U.S.C. § 2104(a)(1).  The Act defines an "employer" as "any business enterprise that *employs* – **(A)** 100 or more employees, excluding part-time employees; or **(B)** 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1) (emphasis added).

In the present case, Defendants argue primarily that Plaintiffs cannot hold them liable

under the WARN Act because they are not *employers* who *ordered* a plant closing or mass layoff.

Several courts, although not the Second Circuit, have considered when a creditor might become an "employer" for purposes of the WARN Act.  The Ninth Circuit, after examining the Act's text and the commentary that accompanies applicable Department of Labor regulations,

> conclude[d] that WARN's obligations indeed can apply to a secured creditor, but only where the creditor operates the debtor's asset as a "business enterprise" in the "normal commercial sense." . . . On the other hand, where the creditor does no more than exercise that degree of control over the debtor's collateral necessary to protect the security interest, and acts only to preserve the business asset for liquidation or sale, the notice requirement of WARN will not apply "precisely because the [defendant has not] continue[d] the business in operation." . . .

*Chauffers, Sales Drivers, Warehousemen & Helpers Union Local 572, Int'l Bhd. of Teamsters, AFL-CIO v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) (quotation and internal citation omitted).

The Ninth Circuit then applied its holding to the facts of that case:

> Mr. Rooney apparently did not participate in decisions concerning the plant's production output, the marketing of the plant's product, or the plant's employment practices.  Without some evidence showing Mr. Rooney's involvement in the functional operations of the Weslock facility, there can be no finding that Westinghouse is an employer under WARN. . . .
>
> * * *
>
> Unquestionably, the record demonstrates that Mr. Rooney maintained an on-going involvement in Weslock's financing problems . . . [and] often was responsible for approving or disapproving the additional advancement of Westinghouse funds to discharge Weslock's monetary obligations.  But Mr. Rooney's relationship to the Weslock management was consistent with the type of control a secured creditor legitimately may exercise over a defaulting debtor to protect collateral securing a loan. . . .

-10-

*Id.* at 245 (internal citations omitted).

Based upon the application of the law to the facts of that particular situation, the court

proceeded to conclude that the creditor was not an employer under the WARN Act.  *See id.*

The Eighth Circuit also addressed this issue in *Adams v. Erwin Weller Co.*, 87 F.3d 269

(8th Cir. 1996).  In that case the court noted that "[a] lender can legitimately restrict its

borrower's financial and business activities, monitor the borrower's business doings, and

participate in the borrower's management, to protect the lender's investment and the collateral

securing its loan."  *Id.* at 271 (citations omitted).  Consequently, "[o]nly when a lender becomes

so entangled with its borrower that it has assumed responsibility for the overall management of

the borrower's business will the degree of control necessary to support employer responsibility

under WARN be achieved."  *Id.* at 272.

The court in *Adams* further considered and rejected the plaintiffs' arguments.  Most

pertinent to the instant case, the plaintiffs in *Adams* argued that "WCC should be considered their

employer because 'WCC's influence affected the management of the corporation.'"  *Id.*  The court

noted that

> [f]aced with a precarious financial situation, EWC asked WCC for
> additional working capital and a more liberalized payment
> schedule on its loans.  In response, WCC expressed concerns about
> the effectiveness of EWC's management, and suggested that EWC
> hire a crisis-management consultant to help improve the company's
> financial performance.  Acting on its own, EWC replaced its
> president with one of the consultants recommended by WCC.
> Based on the consultant's evaluation of EWC's future prospects,
> WCC granted EWC's request for additional working capital.
> Although the employees contend this interplay shows WCC was
> actually in control of EWC's business operations, these actions
> were nothing more than a major lender's attempt to work with a
> troubled borrower and nurse it back to financial health.  Contrary

-11-

> to the employees' view, WCC did not become a WARN employer
> because it proposed methods to improve EWC's profitability,
> suggested new management, and stepped up its verifications to
> keep track of EWC's deteriorating financial condition.  Major
> lenders do these sort of things all the time.  Indeed, lenders often
> make suggestions to troubled borrowers and, unlike this case, the
> suggestions are frequently coupled with financial threats.

*Id.*

The Eighth Circuit also rejected the plaintiffs' argument that WCC was their employer because its eventual refusal to extend further credit to EWC resulted in the plant closure.  *See id.* at 272-73 (citation omitted).

The Third Circuit likewise addressed this issue in *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001).  After an extensive discussion of the relevant case law and legal principles, the court concluded that courts should look to factors that the Department of Labor regulation, 20 C.F.R. § 639.3(a)(2), articulates to determine whether a creditor is an employer for purposes of the WARN Act.  *See id.* at 494-95; *see also Administaff Cos., Inc. v .N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 458 (5th Cir. 2003) (footnote omitted) (quoting *Pearson*, 247 F.3d at 490).[3,4]  However, unlike the courts in *Weslock* and *Adams*, the court stated

---

[3] Section 639.3(a)(2) provides that

> [u]nder existing legal rules, independent contractors and
> subsidiaries which are wholly or partially owned by a parent
> company are treated as separate employers or as part of the parent
> or contracting company depending upon the degree of their
> independence from the parent.  Some of the factors to be
> considered in making this determination are (i) common
> ownership, (ii) common directors and/or officers, (iii) de facto
> exercise of control, (iv) unity of personnel policies emanating from
> a common source, and (v) the dependency of operations.

(continued...)

-12-

that is determination would not "be dominated by an assessment of whether the defendant's behavior was 'typical' of a secured lender . . . ."  *Pearson*, 247 F.3d at 495 (citations omitted).

After fully discussing the application of the 20 C.F.R. § 639.3(a)(2) factors to the facts in *Pearson*, the court concluded that

> [t]he evidence proffered by the plaintiffs simply does not establish the high degree of integration required by the analysis set forth in this opinion.  Though GECC may have monitored much of the activity at CompTech, there is no question that at all times CompTech remained an entirely separate business entity that did not rely on GECC to supply it with personnel, equipment, facilities, clients, administrative services, or any of the other various resources typically "shared" between companies that are ultimately found liable for each others' debts. . . .
>
> Although the plaintiffs have created a genuine issue of fact with respect to GECC's ownership of CompTech, they have failed to meet their burden with respect to the other facets of the DOL test.  The existence of an "agency" relationship between GECC and CompTech's CEOs would not establish the existence of "common directors and/or officers," and, without evidence establishing not only that an agency relationship existed, but also the scope of that relationship, the plaintiffs cannot rely on the "agency" theory to establish "dependency of operations."  Additionally, under the circumstances presented here, GECC's decision to call its loan does not give rise to an inference of "de facto exercise of control."

*Id.* at 505-06.

Although *Pearson* is not binding on this Court, because it is the most recent Circuit Court decision to address the issue of when a creditor may be considered an employer for purposes of

---

[3](...continued)
20 C.F.R. § 639.3(a)(2) (2005).

[4] In the context of determining whether a parent entity was an employer of its subsidiary's employees, one district court in this Circuit has followed *Pearson* and applied the 20 C.F.R. § 639.3(a)(2) factors.  *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 140-41 (S.D.N.Y. 2004) (quotations and other citations omitted).

the WARN Act, is well-reasoned, has been followed by subsequent cases, and appears to be a

refinement of the approach that the courts took in *Weslock Corp.* and *Adams*, the Court adopts

*Pearson*'s reasoning and will follow its analysis.


### 1. Common ownership

Defendants contend that there was no common ownership between them and NFC.

Although they concede that NFC's majority shareholders executed pledge agreements granting

Defendant Bear Stearns a security interest in their NFC stock, they argue that the pledgors

retained their voting and dividend rights until such time as Defendant Bear Stearns gave notice

that it was executing its security rights to the stock.  They assert that Defendant Bear Stearns

never gave such notice, foreclosed on or otherwise owned the stock, or took any action to vote

the stock.  To the contrary, Plaintiffs assert that NFC's majority shareholders' pledge to

Defendants effected a transfer of ownership.

David and Joseph Silipigno, representing 68% and 28% of NFC's issued and outstanding

stock respectively, executed essentially identical stock pledge agreements dated November 22,

1999.  Each agreement provided that "[t]he Pledgor hereby delivers to EMC all the Pledged

Stock and hereby grants to each Pledgee, [sic] a first security interest in the Collateral, as

collateral security for the prompt and complete payment and performance when due (whether at

the stated maturity, by acceleration or otherwise) of the Obligations."  *See* Dkt. No. 72 at Pt. 24 at

13, 25.  Each agreement also provided that

> [w]hile this Pledge Agreement remains in effect and prior to notice
> by any Pledgee to Pledgor of the exercise by Pledgee of any rights
> under Section 7 hereof, Pledgor shall have the right to receive cash

> dividends validly declared by the Issuer's Board of Directors and to
> exercise voting and corporate rights with respect to the Pledged
> Stock. After notice by any Pledgee to Pledgor of the exercise by
> such Pledgee of any rights under Section 7 hereof, all cash
> dividends paid in respect of the shares of the Pledged Stock shall
> be paid to EMC . . . and the shares of the Pledged Stock, if so
> requested by EMC, shall be registered in the name of EMC or its
> nominee, and EMC or its nominee may exercise (before or after
> any such registration) (i) all voting, corporate and other rights
> pertaining to such shares of the Pledged Stock at any meeting of
> shareholders of either the Issuer or otherwise and (ii) any and all
> rights of conversion, exchange, subscription and any other rights,
> privileges or options pertaining to such shares of the Pledged Stock
> as if it were the absolute owner thereof . . . .

*See id.* at 16, 28.

In addition, section 7 of each agreement provided, in pertinent part, that

> [i]f an Event of Default shall occur and be continuing, upon written
> notice to Pledgor, any Pledgee may exercise, in addition to all other
> rights and remedies granted in this Pledge Agreement and in any
> other instrument or agreement securing, evidencing or relating to
> the Obligations, all rights and remedies of a secured party under
> the [Uniform Commercial Code]. . . .

*See id.* at 16-17, 28-29.

Each agreement defines an "Event of Default" as "any default or event of default with

respect to the Letter Agreement, the Loan Purchase Agreement, the Master Repurchase

Agreement dated as of July 15, 1997 between the Trust and NFC, and the Master Repurchase

Agreement dated as of January 19, 1998 between BSIL and Funding." *See id.* at 13, 25. Finally,

David and Joseph Silipigno each represented and warranted that he "underst[ood] that the

Obligors are currently in default under certain agreements each Obligor has with a Bear Stearns

Entity and that such Bear Stearns Entities may currently enforce their rights against the Obligors

and against the Pledgor." *See id.* at 14, 26.

-15-

Reading the stock pledge agreements as a whole, it appears that, as of November 22, 1999, Defendants were entitled to give written notice of an event of default to David and Joseph Silipigno and then exercise majority shareholder control over NFC.  However, there is nothing in the record to indicate that Defendants ever gave such notice.

The question then arises whether the mere immediate right to exercise majority shareholder control qualifies as ownership for purposes of determining whether a party is an employer under the WARN Act.  Although this question appears to be a novel one, the Court concludes that the more reasonable answer is "no."  It is difficult to see how mere potential to take a certain action equates to responsibility for someone else's taking that action.  Defendants could have given David and Joseph Silipigno notice and then voted the shares to dissolve NFC, but they never did so.  Without some evidence that Defendants got someone to do something as a consequence of their possession of the stock pledge agreements, the Court concludes that the mere possession of those agreements does not constitute ownership of NFC; and, therefore, this factor weighs against a finding that Defendants were Plaintiffs' employer for purposes of the WARN Act.[5]

### 2. Common directors and/or officers

> This factor . . . ordinarily looks to whether the two nominally
> separate corporations: (1) actually have the same people occupying
> officer or director positions with both companies; (2) repeatedly
> transfer management-level personnel between the companies; or
> (3) have officers and directors of one company occupying some

---

[5] In support of their motion for summary judgment, Plaintiffs assert that Defendants were purchasers of NFC for purposes of the WARN Act.  For the same reasons that the possession of stock pledge agreements does not establish ownership, it also fails to show purchase.

> sort of formal management position with respect to the second
> company.

*Pearson*, 247 F.3d at 498 (citations omitted).

Defendants contend that they and NFC had no common directors and/or officers.

Plaintiffs respond that Defendants fired NFC's board of directors and then left those positions

vacant.  Although Plaintiffs cite to several portions of the record to support their position, none

of them indicates that Defendants fired NFC's board of directors.  Rather, the most relevant

citation, the November 23, 1999 Letter Agreement, after defining NFC and NFC Funding as the

"Companies," stated that

> [e]ach of the Companies represents that its Board of Directors,
> acting under its own volition, has determined that the execution
> and delivery of this Letter Agreement is in its best interests and
> represents the best prospect for addressing its financial
> circumstances and for the realization of value for each Company
> and its shareholders.  Each of the Companies represents that its
> Board of Directors, acting under its own volition and in the best
> interest of NFC and Funding, as the case may be, has accepted the
> resignation of David B. Silipigno, CEO and Chairman of each of
> the Boards of Directors ("Prior Management") from NFC and
> Funding, as the case may be, and has agreed with Joseph Silipigno,
> Executive Vice President and Director that such person is on
> unpaid leave of absence from NFC and Funding, as the case may
> be (the "Relative").  The Board of Directors is actively seeking new
> management for NFC and Funding, as the case may be, which is
> unaffiliated with Prior Management.  In the interim, and pending a
> sale of each Company, each Company has appointed Harvey
> Marcus as its President and CEO.

*See* Dkt. No. 76 at 9 at ¶ 3.

Although this letter agreement makes clear that Defendants did not fire NFC's board of

directors, it is somewhat ambiguous with respect to whether the resignation and leave of absence

provisions related to David and Joseph Silipigno's positions as officers only or also their

-17-

positions as directors.  However, the Unanimous Consent clarifies this ambiguity:

> 1.     Harvey I. Marcus is hereby elected as the President and
>        Chief Executive Officer of the Company . . . .
>
> 2.     Harvey I. Marcus is authorized to take any and all action on
>        behalf of the Company in the ordinary course of business to
>        manage and operate the Company and to implement,
>        execute, and perform the provisions of that Letter
>        Agreement of November 22, 1999 . . . all without prior
>        notice to or the necessity of consent by the Board of
>        Directors of the Company, that notice being waived and
>        that consent being given in advance.
>
> * * *
>
> 4.     David B. Silipigno and Joseph Silipigno hereby confirm
>        their resignation as *Officers* of the Company effective
>        November 23, 1999.
>
> 5.     The undersigned do hereby give full power and proxy to
>        Harvey I. Marcus to vote the common stock owned by them
>        in the Company and to vote on behalf of the undersigned as
>        and when action may be required by the Board of Directors
>        of the Company . . . .
>
> 6.     The undersigned execute this Unanimous Consent fully
>        intending to be bound by its terms both as Stockholders of
>        the Company and as the sole Members of the Board of
>        Directors of the Company.

*See* Dkt. No. 76 at Pt. 22.

This Unanimous Consent makes clear that David and Joseph Silipigno remained directors

of NFC although they transferred their authority as directors to Harvey Marcus.

Therefore, despite Plaintiffs' assertion to the contrary, based upon this evidence and the

absence of any proof to the contrary, the Court concludes that Defendants and NFC did not have

common directors and/or officers and that, therefore, this factor weighs against a finding that

Defendants were Plaintiffs' employer for purposes of the WARN Act.

### 3. Unity of personnel policies emanating from a common source

In *Pearson*, the Third Circuit

> interpret[ed] the language of this prong to require the factfinder to
> focus the inquiry less on the hierarchical relationship between the
> companies (as such relationships may be considered in other
> aspects of the test) than on whether the companies actually
> functioned as a single entity with regard to its relationships with
> employees.

*Pearson*, 247 F.3d at 499.

In addition, in *Vogt*, the court noted that

> [t]his aspect of the DOL test is analogous to the aspect in the
> federal labor law test concerning "centralized control of labor
> operations," which the Second Circuit has considered to include
> factors such as centralized hiring and firing, payment of wages,
> maintenance of personnel records, benefits and participation in
> collective bargaining.

*Vogt*, 318 F. Supp. 2d at 142-43 (citing *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 138-39 (2d Cir. 1985)).

As an initial matter, Plaintiffs have not pointed to anything in the record regarding most of the factors that the court, citing the Second Circuit, mentioned in *Vogt*. Moreover, with respect to hiring and firing, Plaintiffs advance an argument that would prove disastrous for creditor-corporate debtor relations. Basically, they argue that, because Defendants always had the right to terminate NFC's credit by ceasing to purchase loans as NFC originated them, Defendants effectively were responsible for every decision of financial significance that NFC made. The record indicates that Defendants contemplated two options. First, they could exercise

-19-

their legal rights under the various agreements between them and NFC by seizing and liquidating the collateral that secured NFC's liability.  Second, they could work with NFC, despite its serious default under the agreements, to allow NFC to operate until it could locate a purchaser. Defendants chose the second option, thereby allowing NFC to remain open longer.  However, Defendants' decision to make financial outlays in the hope of future recoupment did not obligate them to continue making outlays regardless of how improbable such recoupment might become. If a defaulting debtor makes decisions that threaten its creditor's collateral, the creditor should be free to exercise its legal interests over the collateral.  The existence of that freedom, however, does not, of itself, transform the creditor into the employer of the debtor's employees.

Furthermore, Plaintiffs' assertions that Defendants were "okay with," "did not object to," or "were not comfortable with" particular NFC employees does not indicate that Defendants hired or fired such employees nor do Plaintiffs' assertions that certain NFC employees "believed" that Defendants were responsible for certain employee decisions.  Finally, and most importantly, Defendants' decision not to advance NFC the amount that it needed to meet its payroll obligations, a decision which Defendants were perfectly free to make, does not suggest that Defendants made the decision to fire NFC's employees.

For all of these reasons, the Court concludes that this factor weighs against a finding that Defendants were Plaintiffs' employer for purposes of the WARN Act.

**4. Dependency of operations**

In *Pearson*, the Third Circuit stated that it

> consider[s] the "dependency of operations" factor to be virtually
> identical to the integrated enterprise test's "interrelation of
> operations" factor, and will consider it in that light.  When
> examining the "interrelation of operations" factor, courts generally
> consider the existence of arrangements such as the sharing of
> administrative or purchasing services . . ., interchanges of
> employees or equipment . . ., and commingled finances, . . .

*Pearson*, 247 F.3d at 500 (internal citations omitted); *see also Vogt*, 318 F. Supp. 2d at 143
(citation omitted).

The court went on to note that

> [c]ontrol over day-to-day operations has been held to be indicative
> of interrelation of operations. . . .  However, the mere fact that the
> subsidiary's chain-of-command ultimately results in the top officers
> of the subsidiary reporting to the parent corporation does not
> establish the kind of day-to-day control necessary to establish an
> interrelation of operations. . . .

*Pearson*, 247 F.3d at 501 (internal citations omitted).

Plaintiffs have not pointed to any evidence in the record that Defendants and NFC shared

administrative or purchasing services.  There is also no evidence that Defendants and NFC

interchanged equipment.  Although Defendants hired the Clayton Group to work at NFC's office

to review loan applications to determine whether they met Defendants' underwriting criteria, the

record indicates that the Clayton Group's employees were there to protect Defendants' financial

interests rather than to assist NFC in pursuing its interests.

Despite the lack of any evidence of dependency of operations, Plaintiffs, nevertheless,

argue that the record reveals various forms of NFC's dependence upon Defendants.  First, they

contend that Defendants' decision to fund NFC's payroll for one pay period is evidence of

-21-

commingling of funds.  The Court disagrees; one payment from one entity to another, whether or not negotiated at arm's length or memorialized in a debt instrument, falls far short of establishing a commingling of funds.  Although the *Pearson* court noted that non-arm's length "loans" would favor a finding of dependency of operation, *see id.* at 502 (citation omitted), a single "loan" is insufficient.

Second, Plaintiffs argue that NFC was completely dependent financially upon Defendants.  However, in *Pearson*, the court effectively rejected such an argument as proof of dependency of operations:

> loans – even from a parent to a subsidiary – cannot be sufficient to satisfy this prong, particularly in this context where there is no serious dispute that GECC, rather than attempting to establish a continuing relationship whereby CompTech would be permanently dependent on GECC for financing, was instead by this point conducting a "rescue" operation in an attempt to "return Company to profitability, [sic]" We surely do not want to discourage companies from attempting to keep their subsidiary operations afloat with temporary loans by holding that the mere fact that loans were even necessary establishes a "dependency of operations" giving rise to liability.

*Id.* at 503 (citation omitted).

Likewise, in the instant case, the record indicates that Defendants were merely seeking to keep NFC afloat until the company could find a purchaser.

Finally, Plaintiffs argue that the fact that Mr. Bradley and Mr. Marcus, although the latter very rarely, reported to Defendants indicates a dependency of operations.  Again, however, as noted above, the court in *Pearson* rejected this argument.  For all of these reasons, the Court concludes that this factor weighs against a finding that Defendants were Plaintiffs' employer for purposes of the WARN Act.

### 5. *De facto exercise of control*

With respect to this factor, the court in *Pearson* noted that

> the "de facto exercise of control" factor is not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership.  **Nor may this factor be used to create liability for a lender's general oversight of its collateral**.  The factor is appropriately utilized, however, if the parent or **lender** was the decisionmaker responsible for the employment practice giving rise to the litigation.  Further, because the balancing of the factors is not a mechanical exercise, if the de facto exercise of control was particularly striking – for instance, were it effectuated by "disregard[ing] the separate legal personality of its subsidiary," . . . – then liability might be warranted even in the absence of the other factors.

*Id.* at 503-04 (internal citation omitted) (emphasis added).

Plaintiffs argue that Defendants' decision not to provide, for a second time, NFC with funds for its payroll gave them *de facto* control over NFC's decision to close.  Although Plaintiffs seek to compare and contrast the circumstances of the instant case with those in *Pearson*, the distinctions upon which they rely are unavailing.  In *Pearson*, the creditor, who the court concluded was not a WARN Act employer, acted affirmatively by calling its loans.  In contrast, Defendants, in the present case, took no affirmative action; they merely declined to extend funds that they were not legally obligated to provide.  In addition, in *Pearson*, the record contained the creditor's internal document reflecting its decision, two weeks prior to the debtor's closing, that it intended to liquidate the debtor.  In the instant case, however, there is no evidence of a similar decision on Defendants' part.

The court in *Pearson* also noted that

> we must be scrupulous in our efforts to distinguish between situations in which a parent/lender has ultimately assumed

> responsibility for the continuing viability of a company (thus
> incurring liability for WARN Act violations) and situations in
> which the borrower has retained the ultimate responsibility for
> keeping the company active.

*Id.* at 505.

In the present case, the November 23, 1999 Letter Agreement provided, in pertinent part,

that

> NFC represents that it has retained Westwood Capital, LLC
> ("Westwood") to advise NFC with respect to the sale, and to
> identify prospective candidates for the purchase of NFC, and
> agrees that NFC shall exercise its commercially reasonable efforts
> to effect, as soon as is possible, the sale of NFC on commercially
> reasonable terms. . . .

*See* Dkt. No. 76 at Pt. 9 at ¶ 4.

Also, although the agreement generally prevented NFC and NFC Funding from incurring

additional indebtedness, it made an exception for debt "incurred to finance the origination and

acquisition of mortgage loans . . . ." *See id.* at ¶ 11(b). Finally, the agreement provided that

"NFC acknowledges that it has no obligation to sell mortgage loans under the Loan Purchase

Agreement and that it is free to sell mortgage loans to any third party." *See id.* at ¶ 22. As these

provisions make clear, Defendants, NFC and NFC Funding agreed both that the intended end

result of their relationship was the near-term sale of NFC and that, in the interim period, NFC

was not obligated to deal exclusively with Defendants. Based upon this evidence, the Court

concludes that Defendants did not assume responsibility for the continuing viability of NFC and,

thus, concludes that this factor weighs against a finding that Defendants were Plaintiffs' employer

for purposes of the WARN Act.

*6. Summary*

There is no question that NFC was in serious financial condition prior to its closure. There is also no question that Defendants technically had the ability to keep NFC afloat for some time.  However, the record contains no indication that Defendants exercised day-to-day control over NFC's operations, treated NFC as a component entity, or decided that NFC should close its doors.  Moreover, if Plaintiffs' view were to prevail, creditors would be seriously discouraged from becoming involved in seeking to rehabilitate struggling debtors.  The consequence would be an increase in swift foreclosures and, consequently, an increase in employment terminations, a result seemingly at odds with the purposes and the welfare of the intended beneficiaries of the WARN Act.  Therefore, applying the *Pearson* factors to the facts of this case, the Court concludes that Defendants are not Plaintiffs' employer for purposes of the WARN Act.

## IV. CONCLUSION

Accordingly, having reviewed the parties' submissions, the entire record in this matter, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that Defendants' motion to strike Plaintiffs' jury demand is **DENIED AS MOOT**; and the Court further

ORDERS that Defendants' cross-motion to strike the affidavit of Plaintiffs' counsel, Michael D. Assaf, is **DENIED AS MOOT**; and the Court further

ORDERS that the Clerk of the Court enter judgment in Defendants' favor and close this case.

**IT IS SO ORDERED.**

Dated: October 17, 2005
       Syracuse, New York

Frederick J. Scullin, Jr.
Chief United States District Court Judge